## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

Jason Sabel, derivately on behalf )
of Higher One Holdings, Inc. )
          )    Case No. 13:15-cv-00346
       Plaintiff, )
          )
    v. )
          )    **Verified Shareholder Derivative**
Marc Sheinbaum, Thomas Anderson, )    **Complaint**
Paul Biddelman, Samara Braunstein, )
David Cromwell, Bob Hartheimer, )
Miles Lasater, Patrick McFadden, )
Mark Volchek , and Lowell Robinson, )
          )
       Defendants, )
          )
     and )
          )
Higher One Holdings, Inc., )
          )
       Nominal Defendant. )
_____

Plaintiff Jason Sabel ("Plaintiff"), by and through his undersigned attorneys, hereby

submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of

nominal defendant Higher One Holdings, Inc. ("Higher One" or the "Company") against certain

members of its Board of Directors (the "Board") and executive officers seeking to remedy

Defendants' breaches of fiduciary duties from approximately February 2014 to the present (the

"Relevant Period").

## NATURE OF THE ACTION

1.      According to its public filings, Higher One provides payment, refund

disbursement and data analytics and management tools to educational institutions and students

throughout the United States.  Some of the services  Higher One offers include FDIC-insured online checking accounts, called OneAccounts, to students,  faculty, staff, and alumni and a debit MasterCard ATM card.  These offerings are marketed to students, faculty and staff through arrangements with each educational institution.

2.      Immediately prior to the start of the Relevant Period, Higher One had a history of legal problems stemming from its deceptive marketing and unfair fees practices on these cards and accounts.  These issues resulted in an August 2012 Consent Order with the Federal Deposit  Insurance Corporation ("FDIC"), whereby Higher One agreed to return approximately $11 million to college students for improper practices in violation of the Federal Trade Commission  Act, agreed to make various operational reforms, and significantly, agreed to implement a robust corporate compliance infrastructure. Higher One's misconduct also caused it to be targeted in several class action lawsuits which later settled for $15 million and a similarly commitment  to pertinent reforms.  These facts, along with Higher One's own Code of Business Conduct, gave Defendants actual notice of prior misconduct and required each Board member to vigilantly ensure that similar illegal acts not be perpetuated in the future.  In breach of their fiduciary duties to Higher One, Defendants failed to do so.

3.      During the  Relevant Period,  Defendants made  repeated  positive  statements regarding  their efforts to ensure legal compliance, the sufficiency of Higher One's internal controls, and  their assessment that their exposure stemming from the conduct addressed by the FDIC had been  capped.  These statements masked the true state of affairs at Higher One and caused the Company's stock to trade at inflated prices throughout the Relevant Period.

4.      Throughout the Relevant Period, Defendants misrepresented  the  true  state  of Higher  One's  operations and breached their fiduciary duties to the Company by: (i) failing to

ensure that Higher One had implemented meaningful reform measures; (ii) failing to ensure legal compliance when they had actual knowledge of prior, identical issues; (iii) failing to employ adequate internal controls; and (iv) allowing the exact same misconduct as had been at issue prior to the Relevant Period in violation of the same laws at issue in the FDIC Consent Order and the consumer class action. Defendants' breaches of fiduciary duties have exposed Higher One to massive potential liabilities to consumers and federal regulators. Perhaps most egregiously, when Higher One had its relationship with a partner bank terminated during the Relevant Period due to this misconduct, Defendants concealed the true reasons and characterized it as a "mutual" decision to part ways – even when asked directly about it by analysts. Defendants also failed to disclose that the misconduct at issue was so severe that Higher One is now exposed to $70 million in potential liabilities and risks default on its Credit Facility, which has had an outstanding balance in excess of $90 million – an amount that Higher One cannot repay absent additional lending.

5.     The truth was revealed in mid-2014. Collectively, Defendants' statements revealed that the Federal Reserve's investigation into Higher One's misconduct involving its flagship OneAccount and multiple of its bank partners was serious enough that it could cost up to $35 million in consumer restitution and risked default on Higher One's credit facility; that Higher One might have to pay an additional $35 million in consumer restitution to consumers whose bank account was held at FDIC-regulated bank partners of Higher One; and that Higher One lacked sufficient funds to pay these potential liabilities absent additional lending. These disclosures caused Higher One's stock price to plummet.

6.     As a result of Defendants' breaches of fiduciary duties alleged herein, Higher One's SEC filings throughout the Relevant Period were materially false and misleading,

and Higher One has suffered additional significant losses and damages, including to its stock price and market capitalization.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs.  In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant Higher one is headquartered in this District.  In addition, a portion of the occurrences complained of herein occurred in this District and one or more of the Defendants either resides in, or maintains offices in, this District.

## PARTIES

9.      Plaintiff is a current stockholder of Higher One common stock and has continuously held Higher One stock since his purchase in February 2014.  Plaintiff is a citizen of Oregon.

10.      Nominal Defendant Higher One is a Delaware corporation with its principal executive offices located at 105 Munson St, New Haven, CT 06511. Higher One's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ONE."

11.      Defendant Marc Sheinbaum ("Sheinbaum") is the Company's President and Chief Executive Officer and a member of the Board and has been a director since April 16, 2014. Upon information and belief, Sheinbaum is a citizen of Connecticut.

12.      Defendant Marc Volchek ("Volchek") is a co-founder of the Company, a director

and former President, Chief Executive Officer and Chief Financial Officer of the Company. Volchek currently serves as a part time employee. Upon information and belief, Volchek is a citizen of Connecticut.

13.     Defendant Miles Lasater ("Lasater") is a co-founder of the Company, a director and current Chairman of the Board. He currently serves as a part time employee of the Company. Upon information and belief, Lasater is a citizen of Connecticut.

14.     Defendant Paul Biddelman ("Biddelman") is a current director and has served on the Board since 2002. According to Higher One's public filings, Biddelman is the president of Hanseatic Corporation, a private investment company and "the manager of [Higher One's] investor, Hanseatic Americas LDC." Biddelman chairs the Nominating and Corporate Governance Committee and serves on the Audit and Compensation Committees. Upon information and belief, Biddelman is a citizen of New York.

15.     Defendant Samara Braunstein ("Braunstein") is a current director and has served on the Board since 2013. Braunstein chairs the Compensation Committee and serves on the Nominating and Corporate Governance Committee. Upon information and belief, Braunstein is a citizen of New York.

16.     Defendant David Cromwell ("Cromwell") is a current director and has served on the Board since 2001.  Cromwell is a Yale Professor and served as a faculty advisor to one of the Company's early advisors (Sachem Ventures) a Yale student run venture capital fund. Cromwell serves on the Nominating and Corporate Governance and Compensation Committees. Upon information and belief, Cromwell is a citizen of Connecticut.

17.     Defendant Robert Hartheimer ("Hartheimer") is a current director and has been a member of the Board since 2012. Hartheimer chairs the Risk and Compliance Committee and

serves on the Audit Committee. Upon information and belief, Hartheimer is a citizen of Washington, D.C.

18.     Defendant Patrick McFadden ("McFadden") is a current director and has been a member of the Board since 2008. McFadden serves on the Audit and Compensation Committees. Upon information and belief, McFadden is a citizen of Connecticut.

19.     Defendant Thomas Anderson ("Anderson") is a current director and has been a member of the Board since August 15, 2014. Anderson serves on the Risk and Compliance Committee. Upon information and belief, Anderson is a citizen of Utah.

20.     Defendant Lowell Robinson ("Robinson") is a current director and has been a member of the Board since June 11, 2014. Robinson chairs the Audit Committee and serves on the Risk and Compliance Committee.

21.     The individual defendants named herein in ¶¶11-20 are collectively referred to herein as "Defendants." This definition excludes Nominal Defendant Higher One.

## DEFENDANTS' DUTIES

23.     By reason of their positions as officers, directors, and/or fiduciaries of Higher One and because of their ability to control the business and corporate affairs of Higher One, Defendants owed Higher One and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Higher One in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Higher One and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Higher One and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the

use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     Defendants, because of their positions of control and authority as directors and/or officers of Higher One, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Higher One, each of the Defendants had knowledge of material non-public information regarding the Company.

25.     To discharge their duties, the officers and directors of Higher One were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Higher One were required to, among other things:

     a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

     b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

     c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

22.     Throughout the Relevant Period, Higher One had in place a Code of Business Conduct, which it had adopted June 17, 2010 (the "2010 Code of Business Conduct") and which was published on its corporate website throughout the Relevant Period. In a section captioned "Business Conduct and Contacts," it set forth several pertinent obligations on each defendant, including (emphasis original):

     (a)     Earn Customer and Vendor Trust. The Company's reputation for integrity is tested every day by the way you treat the people with whom you do business. Honesty, fairness and keeping commitments must be

7

hallmarks of the way you do business.

(b)      Present the Company Truthfully. Communications with the public should reinforce a sense of trust in the Company. Whether statements are channeled through customers, stockholders, the analyst community, trade groups, the mass media or made in private conversation, "honesty is the best policy."

Public statements should be sufficiently candid, clear and complete so that they neither mislead nor lend themselves to misinterpretation.

The Company is also committed to full compliance with all requirements applicable to its public disclosures, including its reports filed or furnished to securities regulators. All of our business communications should be timely, clear and accurate. It is a violation of our policy to misrepresent our financial performance or otherwise compromise the integrity of our financial statements or other public disclosures.

All public statements relating to the Company or its business must first be reviewed and approved by the Company's Investor Relations Director.

23.      Additionally, in a section captioned "Compliance With Law," the 2010 Code of Business Conduct sets for additional requirements, as follows:

The Company strives to be an honorable company and employer. Our employees must always operate within the law in all business dealings. It is the Company's express policy that it and its employees obey all applicable U.S. federal, state, local and international laws and regulations. Employees have a personal responsibility to become familiar and comply with the laws and regulations related to job responsibilities. There are also other laws – not directly related to an employee's job but of general relevance to work situations – of which you should be aware. If you have any questions about what is within the law and what is not, seek advice from the General Counsel.

24.      The 2010 Code of Business Conduct specifically highlights the U.S. securities laws as being among the "***most important laws that apply to the Company, its employees and its business dealings***." (emphasis added). It continues:

Securities Laws. These laws forbid individuals and corporations from profiting from material non-public information, or "inside" information, that could influence decisions to buy, sell or hold onto particular securities. Such information may relate to the financial condition of a company, its products, the market for its securities, its investment intentions or plans for a merger, acquisition or divestiture. You may not make trades of securities based on

8

material inside information or give such information to others.

25.     Defendants Anderson, Hartheimer and Robinson were members of the Board's Risk and Compliance Committee during the time the wrongdoing alleged herein was taking place. The Risk and Compliance Committee has a detailed Charter describing each of these defendants' obligations as members of this Committee, including the following (emphasis added):

### I. Statement of Purpose

The Risk and Compliance Committee (the "Committee") is a standing independent committee of the Board of Directors of Higher One Holdings, Inc. (the "Company"). *The purpose of the Committee is to assist the Board of Directors in fulfilling its oversight responsibility relating to*: (i) the Company's enterprise risk management governance and practices including identifying and managing the Company's applicable risks; (ii) *the Company's compliance with laws and regulations that affect the Company's business, including those arising from its relationships with its banking partners to adhere to various banking and related laws and regulations, including, but not limited to the Federal Deposit Insurance Act, and incorporating Section 5 of the Federal Trade Commission Act and applicable provisions of the Bank Secrecy Act ("banking-related laws"); (iii) the Company's compliance with provisions of its agreements with banking partners concerning banking-related law compliance; (iv) the Company's actions in response to any formal or informal enforcement actions issued by any bank supervisory agency or other government agency; (v) the Company's compliance with Title IV of the Higher Education Act;* and (vi) the fulfillment of the other responsibilities set out herein.

The Committee shall consult with the Audit Committee of the Board of Directors (the "Audit Committee") with respect to policies concerning risk assessment and risk management and in such other areas as required by the applicable listing rules of the New York Stock Exchange. The Committee and the Audit Committee shall consult with each other to avoid unnecessary duplicative oversight.

*** 

### III. Responsibilities

The following shall be the principal responsibilities of the Committee:

A. *Oversight of the Company's Risk Management Practices.* The Committee shall:

1. Identify and review significant risk exposures, evaluate risk tolerance, approve appropriate limits related thereto and oversee the steps management has taken to monitor, control and report such exposures, including, without limitation, financial, liquidity, reputational, operational, compliance, fraud and strategic;

2. Identify and review significant technology and information security (data-security, business-continuity risk, etc.) risk exposure, and oversee the steps management has taken to monitor, control and report such exposures.

3. Review and evaluate the Company's policies and practices with respect to risk assessment and risk management and annually present to the Audit Committee of the Board a report summarizing the Committee's review of the Company's methods for identifying and managing risks;

4. Concur in the appointment of the Company's Chief Risk Officer;

5. Oversee the activities of the Company's Chief Risk Officer, who shall have a reporting line to the Committee and administratively report to a member of management; and

6. Review the risk management control framework, which shall establish common principles and standards for the management and control of relevant risks, inform behavior across the organization, provide a shared framework and language to improve awareness of risk management processes and provide clear accountability and responsibility for risk management.

7. The Committee shall discuss with management the Company's major risk exposures, the adequacy and effectiveness of the Company's controls with respect to such risks and the steps management has taken to monitor and control such exposures.

B. *Oversight of the Company's Compliance Management System and other Compliance Programs.*

The Committee shall:

1. Oversee and monitor the Company's compliance function and the Company's maintenance of a comprehensive compliance management system, consistent with regulatory requirements, which shall also include:

    a. specific procedures designed to ensure that the Company complies with banking-related laws and other laws and regulations;

    b. appropriate training programs for employees designed to instill a culture of compliance among Company employees and to prevent violations

of laws and regulations by the Company acting on the Company's behalf; and

  c. regular reporting by Company management and the Company's Chief Compliance Officer to the Committee, and, as appropriate, the Board, regarding the status of the compliance management system, including identification of significant compliance risks and priorities and evaluation of the effectiveness of the compliance management system.

  2. Concur in the appointment of the Company's Chief Compliance Officer.

  3. Oversee the activities of the Company's Chief Compliance Officer, who shall have a reporting line to the Committee and administratively report to a member of management.

  4. Assess with Company management and the Company's Chief Compliance Officer, and with the Company's legal or other advisors, the Company's compliance with banking-related and other laws, and any significant legal and regulatory exposures or concerns identified by Company management or the Company's Chief Compliance Officer, including with respect to consumer protection and compliance with laws and regulations.

  5. Review reports or other communications received from the Company's banking partners that concern banking-related laws.

  6. Report periodically to the Board regarding the Committee's assessment of the adequacy of the Company's compliance function and Compliance Management System, including management's effectiveness in the execution thereof.

  7. Oversee and monitor the ongoing effectiveness of communications with banking and other government agencies engaged in review or examination of the Company. The Committee shall receive regular reporting by management and the Company's Chief Compliance Officer regarding communications with such agencies, including providing to the Committee copies of written communications to and from such agencies.

  8. Receive, review and discuss reports from management concerning the status of significant examination reports, inquiries, concerns or supervisory actions of banking regulators or other government agencies, and oversee and monitor the Company's timely response to regulatory concerns, ensuring that corrective and preventative actions have been implemented by management.

  26.  Defendants Biddelman, Hartheimer, McFadden and Robinson were members of the Board's Audit Committee during the time the wrongdoing alleged herein was taking place.

The Audit Committee has a detailed Charter describing each of these defendants' obligations as members of this Committee, including the following:

I. Statement of Purpose

The Audit Committee (the "Committee") is a standing committee of the Board of Directors of Higher One Holdings, Inc. (the "Company"). The purpose of the Committee is to assist the Board of Directors in fulfilling its oversight responsibility relating to (i) the integrity of the Company's financial statements internal control system (including the implementation and effectiveness of internal control over financial reporting); (ii) the performance of the internal audit services function; (iii) the annual independent audit of the Company's financial statements, the engagement of the independent auditors and the evaluation of the independent auditors' qualifications, independence and performance; (iv) the implementation and effectiveness of the Company's disclosure controls and procedures; and (v) the fulfillment of the other responsibilities set out herein. The Committee shall also prepare the report of the Committee required to be included in the Company's annual proxy statement.

Management and the independent auditors are responsible for the day-to-day planning or conduct of audits or for any determination that the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles; provided, however, the Committee shall continue to retain oversight responsibility for such function.

The Committee shall consult with the Risk and Compliance Committee with respect to policies concerning risk assessment and risk management.

\*\*\*

III. Responsibilities

F. *Oversight of Internal Control over Financial Reporting.* The Committee shall review with management and the independent auditors the Company's overall system of internal
control, including management's annual assessment of the Company's internal control over financial reporting and the related report issued by the independent auditors. The Committee shall also review with management and the independent auditors (i) significant deficiencies and material weaknesses in the design or operation of the Company's internal control over financial reporting; (ii) any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting; and (iii) changes in the Company's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, such internal control over financial reporting.

G. *Review of Disclosure Controls and Procedures.* The Committee shall review with the Chief Executive Officer, the Chief Financial Officer and the General Counsel the Company's disclosure controls and procedures and shall review periodically, but in no event less frequently than quarterly, management's conclusions about the effectiveness of such disclosure controls and procedures, including any material non-compliance with them.

H. *Review of Annual SEC Filings.* The Committee shall review with management and the independent auditors the financial information to be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Form 10-K), including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," their judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments made in the preparation of the financial statements and the clarity of the disclosures therein. The Committee shall also discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB (United States) or applicable law or listing standards. The Committee may discuss with the national office of the independent auditors issues on which it was consulted by the Company's audit team and matters of audit quality and consistency. Based on such review and discussion, the Committee shall determine whether to recommend to the Board of Directors that the audited financial statements be included in the Company's Form 10-K.

I. *Review of Quarterly SEC Filings.* The Committee shall review and discuss with management and the independent auditors the quarterly financial information to be included in the Company's Quarterly Reports on Form 10-Q, including the disclosures under
"Management's Discussion and Analysis of Financial Condition and Results of Operations," and shall discuss any other matters required to be communicated to the Committee by the
independent auditors under applicable standards of the PCAOB (United States) or applicable law or listing standards. The Committee shall also discuss the results of the independent auditors' review of the Company's quarterly financial information conducted in accordance with
applicable standards of the PCAOB (United States).

\*\*\*

P. *Oversight of Ethics Program.* The Committee shall periodically, but not less frequently than annually, review with management, including the General Counsel, the implementation and effectiveness of the Company's ethics program, including the "whistleblowing" procedures referred to above.

In performing such oversight, the Committee shall also review with appropriate members of management, including the head of internal audit (or service providers)

and, if appropriate, the independent auditors any correspondence with, or other action by, regulators or governmental agencies and any employee complaints or published reports that raise concerns regarding the Company's financial statements, accounting or auditing matters or compliance with the Company's Code of Business Conduct and Ethics or other applicable law or listing standards. **The Committee shall have the sole authority for determining whether and on what terms to grant to any Director or executive officer a waiver from the Company's Code of Business Conduct and Ethics.** The Committee shall also meet periodically and separately with the General Counsel to review the material legal affairs of the Company. (Emphasis in original).

## SUBSTANTIVE ALLEGATIONS

27.    According to its corporate website, Higher One provides a wide array of technology-based services on U.S. educational campuses, ranging from streamlining educational institution performance analytics and financial aid refund processes to offering students banking services, tuition payment plans, and financial management. Since its founding in 2000, Higher One now serves more than half of the U.S. higher education market, providing services to over 1,900 campuses and 13 million students nationwide.

28.    Among its services, Higher One provides the "Refund Management" line of disbursement services, including OneDisburse® Refund Management®, which are electronic refund management processes intended to increase efficiency, lower administrative costs, and facilitate the distribution of financial aid and other refunds to students, including Refund Management ID, Campus Payroll, PLUS Loan Refund Management, Financial Intelligence, and Accounts Payable Solution.

29.    Higher One also offers a CASHNET® Payment Solutions and Payment Processing suite of products, such as ePayment to accept online payments; eBill to automate payer billing and processing functions; Tuition Payment Plans to personalize students' payment plans; eMarket to take alumni donations, sell event tickets, T-shirts, and other merchandise, and accept payments of event and conference registration fees; and Cashiering for cashiering

functions, back office payments, and campus-wide departmental deposits.

30.     In addition, Higher One offers a variety of products that facilitate tuition payments and other transactions, including Campus Solutions NetPay providing electronic bill presentment and payment functionality; Campus Solutions Tuition Payment Plans that enable students and their families to make regular monthly payments; and Campus Solutions Refunds, which provide a mechanism for schools to disburse funds to students and parents. Additionally, Higher One provides OneAccounts, which are FDIC-insured online deposit accounts for students, as well as faculty, staff, and alumni; OneCard, which is a debit MasterCard® ATM card; OneAccount Premier and OneAccount Edge for primary account usage; and other retail banking services.

31.     By funneling student loan proceeds and refunds into its OneAccount products, Higher One grew its customer base and was able to charge its student-customers various fees. The nature of such fees and the lack of disclosure regarding their terms are issues at the core of the fraud alleged herein. As discussed below, Higher One's practices in this regard drew the ire not only of consumers, but ultimately regulators as well.

32.     Notably, as a non-bank entity, Higher One ***must*** partner with regulated banks to offer its OneAccount product, serving as the consumer interface for purposes of marketing and transaction services, while relying on its bank partners to comply with the regulatory regime imposed on banking institutions in the U.S. That meant regulatory scrutiny from the regulators of those banks, be it the FDIC or the Federal Reserve – both for Higher One and the specific banks with which it dealt.

33.     Just prior to the Relevant Period, on August 8, 2012, the FDIC issued a press release announcing a settlement with Higher One and its banking partner, The Bancorp Bank

("Bancorp"), for alleged unfair and deceptive trade practices in violation of §5 of the Federal Trade Commission Act (the "FTC Act"). Under the settlement, both Higher One and Bancorp agreed to Consent Orders, and Higher One agreed to provide restitution of approximately $11 million to roughly 60,000 students. The FDIC also imposed civil monetary penalties of $110,000.00 on Higher One. This settlement gave actual, constructive notice to every Board member and each defendant that Higher One had serious legal and compliance issues with respect to FTC Act violations.

34.     In its press release, the FDIC stated that it had determined that Higher One operated its student debit card account program (OneAccount) in violation of §5 of the FTC Act. Among other things, the FDIC found that Higher One was "charging student account holders multiple nonsufficient fund (NSF) fees from a single merchant transaction; allowing these accounts to remain in overdrawn status over long periods of time, thus allowing NSF fees to continue accruing; and collecting the fees from subsequent deposits to the students' accounts,  typically funds for tuition and other college expenses."

35.     Significantly, as described by the FDIC, the Consent Order required Higher One to change the manner in which it imposed NSF fees. Specifically, Higher One was "required: 1) to not charge NSF fees to accounts that have been in a continuous negative balance for more than 60 days; 2) to not charge more than three NSF fees on any single day to a single account; and 3) to not charge more than one NSF fee with respect to a single automated clearing house (ACH) transaction that is returned unpaid within any 21-day period." Moreover, Higher One was required not to make misleading or deceptive representations or omissions in its marketing materials or disclosures. It was also required to "institute a sound compliance management system."

36.     The FDIC press release contained a link to the actual 17-page Consent Order itself (the "2012 FDIC Consent Order").  It stated that the FDIC believed that Higher One has engaged in unsafe or unsound banking practices and violations of law and regulation, including unfair and deceptive acts and practices in violation of §5 of the FTC Act, and that Higher One consented to the issuance of the Consent Order.  It also spelled out the restrictions, prohibitions, and penalties faced by Higher One for its conduct, including the following.

37.     Paragraph 1 of the 2012 FDIC Consent Order expressly barred future misrepresentations and omissions by Higher One in its marketing materials, stating:

> (a)     Higher One shall not make, or allow to be made, any misleading or deceptive representation, statement, or omission, expressly or by implication, in the marketing materials used to solicit any customer or prospective customer, or in any similar communication, in connection with the OneAccount or any consumer or commercial deposit, lending, or other product or service that is or may be offered in conjunction with [the Bancorp Bank] or any "insured depository institution," as that term is defined in 12 U.S.C. § 1813(c)(2) (collectively, "Products and Services").

> (b)     Within sixty (60) days from the effective date of this ORDER, Higher One shall take all action necessary to comply with the guidance set forth in Unfair or Deceptive Acts or Practices by State-Chartered Banks (FIL-26-2004, issued March 11, 2004) and shall not engage in any violations of Section 5 with respect to any Product or Service that is or may be offered in conjunction with the Bank or any insured depository institution. Without limiting the generality of the foregoing, Higher One shall not make, and shall cause its service providers not to make, directly or indirectly, any misrepresentation, expressly or by implication, about any material term of an offer related to any Product or Service that is to be offered in conjunction with the Bank or any insured depository institution in connection with the advertising, marketing, offering, soliciting, extending, billing, or servicing of same, including but not limited to misrepresentations and/or omissions as to:

> (i) any and all fees, including non-sufficient funds ("NSF") fees and overdraft fees, and the circumstances under which more than one NSF fee may be charged with respect to a single transaction or item presented multiple times against a OneAccount; or

> (ii) OneAccount collections, balances, or other OneAccount terms or requirements.

38.     Paragraph 2 of the 2012 FDIC Consent Order also spelled out Higher

One's extensive obligations to create a sufficient compliance management system, stating,

*inter alia*:

(a)     Within sixty (60) days from the effective date of this ORDER, Higher One shall review, revise, develop, and/or implement, as necessary, a sound risk-based compliance management system, including a comprehensive written compliance program ("Compliance Program") to ensure that Products and Services comply with consumer protection and fair lending laws, including Section 5, implementing rules and regulations, and regulatory guidance and statements of policy (collectively "Consumer Protection Laws"). Without limiting the generality of the foregoing, Higher One shall ensure that the Compliance Program includes effective monitoring systems for any such Product or Service with provisions requiring:

(i) review and approval by Higher One and, as applicable, by the Bank or other insured depository institutions of (1) all marketing, advertising, and solicitation materials, including direct mail or internet solicitations, promotional materials, and telemarketing scripts; (2) other materials provided to customers or potential customers generated in connection with the marketing, administration, and servicing of such Product or Service, including agreements, privacy policies, and statements; and (3) any material changes or amendments thereto; and maintenance of copies of the above-described materials by Higher One; …

(v) monitoring by Higher One of the performance of marketing and solicitation programs;

(vi) periodic compliance reviews, including on-site visits as appropriate, by Higher One of partners, vendors, and servicers whose role is material to the Products or Services; …

(vii) maintenance of records by Higher One of all approved Product or Service materials, complaints and responses, customer solicitation materials, administrative materials, and service provider agreements; …

(b)     Higher One shall ensure that its Compliance Program provides for the establishment and implementation of an effective training program for appropriate personnel that includes regular, specific, comprehensive training on applicable Consumer Protection Laws for employees having responsibilities that relate to Consumer Protection Laws, including senior management and the Board, commensurate with their individual job functions and duties. …

39.     Later in Paragraph 2, the 2012 FDIC Consent Order describes an audit requirement, to ensure compliance, stating:

> (d) Higher One shall ensure that its Compliance Program includes a compliance audit component as necessary to ensure an effective and independent review of its internal policies and procedures and compliance with Consumer Protection Laws and includes policies, procedures, and processes that ensure:
>
> (i) audit practices and procedures that are consistent with Generally Accepted Auditing Standards, are independent and adequate in scope;
>
> (ii) completion of a compliance audit plan each calendar year that is reviewed and approved by the Board;
>
> (iii) annual risk assessments to ensure that compliance audits are performed with reasonable frequency;
>
> (iv) assignment of ratings or expressions of opinion as to the adequacy, effectiveness, and efficiency of the internal control environment and compliance audit findings, deficiencies, and recommendations relating to a Product or Service, as documented in a written report and provided to the Audit Committee of the Board, with that Committee's review of the written report documented in its minutes, together with a report of the Committee's actions in response to the audit, including where applicable an explanation why a recommendation has not been implemented; and
>
> (v) provisions for an adequate formal tracking and monitoring system for exceptions identified by compliance audits and regulatory examinations.

40.     The foregoing sanctions, and Defendants' underlying misconduct that caused them, also resulted in Bancorp being sanctioned by the FDIC. Specifically, it was required to enter into a similar Consent Order with FDIC. In addition to imposing a similar compliance management and audit system as was imposed on Higher One, Bancorp's Consent Order with FDIC also expressly included provisions regarding managing third party risk – like those that had been caused by Higher One – and restrictions on entering into new third party relationships. Bancorp was also required to notify FDIC in writing of the date on which new Higher One accounts had ceased to be opened, the date on which all existing Higher

One accounts were transferred, and the date on which it had terminated its contractual relationship with Higher One. Thus, Defendants' misconduct had not only harmed the Company financially, it had cost Higher One its partner relationship with Bancorp and had harmed Bancorp's reputation as well as its own.

41.     Higher One was able to replace Bancorp with new successor bank partners, which together would perform the services previously performed by Bancorp: (a) Urban Trust Bank ("Urban Trust"), a federal savings bank, (b) Wright Express Financial Services Corporation ("Wright Express"), a Utah industrial bank, and (c) Cole Taylor Bank ("Cole Taylor"), an Illinois chartered bank and Federal Reserve member. Notably, whereas the Bancorp relationship had subjected Higher One to oversight by the FDIC only, these successor banking relationships would subject it to increased regulation, given that Urban Trust is regulated by the FDIC, Wright Express is regulated by Utah state regulators, and Cole Taylor is regulated by both the Federal Reserve and Illinois state regulators.

42.     Higher One thereafter was obligated to operate in accordance with not only the 2012 FDIC Consent Order, but also the requirements imposed and overseen by each of these regulatory bodies. Its failure to do so would jeopardize its successor bank partner relationships, without which it cannot offer banking-related products like its OneAccount product and derive revenues therefrom, would expose it to additional sanctions and penalties, and would damage its reputation and ability to continue to ink new successor bank contracts.

43.     On October 18, 2012, Defendants caused Higher One to announce in a press release and a Form 8-K filed with the SEC that it had entered into a new five-year $200 million senior secured revolving credit facility (the "Credit Agreement") to replace its prior $50 million revolving credit facility. The Credit Agreement, Article VII, contained extensive provisions

specifying Events of Default and Remedies. Among the events of default were circumstances described in a subsection called Judgments, which described as an event of default the following:

> Judgments. There is entered against any Loan Party or any Subsidiary thereof (i) one or more final non-appealable judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $10,000,000.00 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect.

The Credit Agreement elsewhere defined "Material Adverse Effect" as, among other things, "a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of" Higher One.

44.     Thus, the Credit Agreement, upon which Higher One's business and operations were highly dependent, expressly barred both the sort of conduct in which Higher One had engaged that had led to the 2012 FDIC Consent Order and the imposition of penalties in the order of magnitude as imposed by the 2012 FDIC Consent Order. The terms of the Credit Agreement were in effect and binding on Higher One throughout the portion of the Relevant Period that post-dated its execution by Higher One.

45.     In addition to the foregoing, class action plaintiffs filed lawsuits in 2012 regarding Higher One's alleged violation of consumer protection statutes. As discussed below, Higher One later reached a settlement concerning this litigation; the $15 million recovery paid to these class plaintiffs underscored the severity of the underlying misconduct at issue.

46.     The class plaintiffs had alleged numerous deceptive marketing improprieties,

including, among others:

     (a)    Higher One forced, or defaulted, consumers into a Higher One account without their consent;

     (b)    Higher One deceptively marketed its products by sending unsolicited and "co- branded" debit cards and accompanying materials, falsely implying that the Higher One account was endorsed or required by the consumer's college or university;

     (c)    Higher One intentionally delated access to financial aid funds for students who chose to use other banking providers besides Higher One's banking partners;

     (d)    Higher One concealed the true costs of its accounts by making incomplete and deceptive disclosures that were difficult to access;

     (e)    Higher One required students who wished to access their financial aid funds immediately to not opt out of the Higher One account created for them, thus coercing students to remain in the default options and use the Higher One accounts; and

     (f)    Higher one made various misrepresentations and omissions, and foreclosed other banking options, in order to inhibit consumers from opting out of the default option.

47.    The class plaintiffs had also alleged an array of misconduct by Higher One regarding fees, including, *inter alia*:

     (a)    Higher One did not make fee information easily accessible to consumers, insofar as the fee schedule was a separate document requiring consumers to click a separate link from the Account Agreement and to read through a page deceptively filled with all of the free services offered by Higher One before finally reaching the fee-

based services page, which were not visible on the first screen page and could only be viewed if the student scrolled down to another page on the website;

(b)     Higher One improperly charged a $29 assessment on Overdraft Fees for accounts used for financial aid funds, including in circumstances where Higher One's systematic approval and debiting of transactions would knowingly result in Overdraft Fees that would turn consumers' Higher One debit cards into credit access devices in violation of federal regulations;

(c)     Higher One took in at least $66 million in so-called "convenience fees" charged to students in 2010, a large portion of which were taxpayer funds designated by the federal government for the strict purpose of meeting educational needs for low- and middle-income students;

(d)     Higher One labelled its card a "debit card" even though the student had to use it as a credit card to avoid the fee and even though some merchants did not provide the option of selecting the "credit card" option, made finding such option difficult at the payment terminal, or gave the option only if the purchase being made was above a minimum amount; and

(e)     Higher One, in effect, charged two service fees for every non-Higher One withdrawal, including a $2.50 non-Higher-One ATM Transaction Fee in addition to the ATM fees charged by the owners of the ATMs used, even though students are effectively forced to use out-of-network ATMs because in-network Higher One ATMs are exceedingly rare and are not available to students at all hours, on weekends, or during school vacations or holidays.

48.     These serious allegations, which Higher One ultimately settled for a payment of

$15 million and other relief, also put Defendants on notice of the deceptive and illegal misconduct that Defendants had previously caused Higher One to engage in regarding its marketing of accounts and the charging of fees.

### Materially False and Misleading Statements Issued During the Relevant Period

49.     During the Relevant Period, Defendants made materially false and misleading statements regarding their compliance with the foregoing commitments and obligations required by the 2012 FDIC Consent Order, Higher One's 2010 Code of Business Conduct, and the Credit Agreement. Defendants failed to manage the Company prudently, and in compliance with these well-understood obligations. As such, they breached their fiduciary duties to Higher One.

50.     On February 13, 2014, Defendants caused Higher One to announce its Q4 2013 financial results. In them, Higher One reported quarterly results of GAAP net income of $6.3 million and GAAP diluted EPS of $0.13 on revenue of $56.6 million (compared to GAAP net income of $12.1 million and GAAP diluted EPS of $0.22 on compared to revenue of $49.8 million in Q4 2013), and annual results of $211.1 million in revenues (compared to revenue of $197.7 million for calendar 2013). The 2/12/2013 Press Release also reported the number of OneAccounts at the end of Q3 2012 as 2.2 million accounts, up 9% from Q4 2013. The 2/13/2014 Press Release quoted defendant Volcheck as saying, "We continue to operate in a difficult and complex operating environment due in part to our relationships with multiple bank partners that are overseen by different regulators."

51.     On March 10, 2014, Defendants caused Higher One to file its annual report on Form 10-K with the SEC (the "2013 10-K"), which it amended via a Form 10-K/A filed with the SEC on April 4, 2014 (the "2013 10-K/A"), both of which were signed and Sox

certified by defendant Volchek and both of which were also signed by defendants Lasater, Biddelman, Braunstein, Cromwell, Hartheimer and McFadden. The 2013 10-K and 2013 10-K/A, falsely stated that "[Higher One] were in compliance with each of the applicable affirmative, negative, and financial covenants of the October 2012 Facility as of December 31, 2013.

52.     In reporting Higher One's Q4 2013 and calendar year 2013 financial results, the 2/13/2014 Press Release, the 2/13/2014 8-K, the 2013 10-K, and the 2013 10-K/A were materially false and misleading because each: (a) described net income, EPS, revenues, and financial and operating results without disclosing that they benefitted from and were the result of operations conducted in violation of applicable laws (including consumer protection laws and §5 of the FTC Act) and Higher One's obligations under the 2012 FDIC Consent Order, its Code of Business Conduct, and its Credit Agreement, and (b) described the number of OneAccounts without disclosing that the marketing and handling of those accounts, including without limitation the disclosure of applicable terms and the charging of various fees, were done in violation of applicable laws (including consumer protection laws and §5 of the FTC Act) and Higher One's obligations under the 2012 FDIC Consent Order, its Code of Business Conduct, and its Credit Agreement. In sum, these results were only achieved by Defendants' breaches of fiduciary duties, including legal violations of the FTA Act and other gross mismanagement of Higher One.

53.     In addition to reiterating Higher One's previously announced quarterly and annual financial results, the 2013 10-K also made the following representations (emphasis added):

(a)     The 2013 10-K repeated prior false and misleading statements regarding Higher

25

One's actions following the 2012 FDIC Consent Order and its remaining exposure to similar penalties:

> In February 2011, the New York Regional Office of the Federal Deposit Insurance Corporation, or FDIC, notified us that it was prepared to recommend to the Director of FDIC Supervision that an enforcement action be taken against us for alleged violations of certain applicable laws and regulations principally relating to our compliance management system and policies and practices for past overdraft charging on persistently delinquent accounts, collections and transaction error resolution.
>
> *          *          *
>
> On August 8, 2012, we received a Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty, or the Consent Order, dated August 7, 2012, issued by the FDIC to settle such alleged violations.
>
> *          *          *
>
> Pursuant to the terms of the Consent Order, we neither admitted nor denied any charges when agreeing to the terms of the Consent Order. ***Under the terms of the Consent Order, we are required to, among other things, review and revise our compliance management system and, to date, we have already substantially revised our compliance management system.***
>
> *          *          *
>
> As a result of the Consent Order and completion of the related examination, ***we believe that all material exposure related to this matter has been recorded and we do not expect any further losses as a result of this matter***.

(b)     In addition, the 2013 10-K made the following false and misleading statements

regarding Higher One's settlement of consumer class actions predating the Relevant Period:

> In October 2013, we reached an agreement in principle on the key terms of a settlement that would resolve all of the above class action litigation that was filed against us in 2012. In February 2014, we executed a settlement agreement, the terms of which include a payment of $15.0 million to a settlement fund, an agreement to pay the cost of notice to the class, ***and an agreement to make and/or maintain certain practice changes.*** On February 14, 2014, Plaintiff asked the court to preliminarily approve the settlement. The court must approve the settlement before it becomes final and binding. There is no assurance that the court will approve the settlement.

54.     While the 2013 10-K made an initial, vague disclosure about a regulatory

investigation, it did not name the "former bank partner" in question as Cole Taylor, did not specify what potential violations of the FTC Act had occurred, did not state which time period was at issue (or whether such time period even post-dated the FDIC Consent Order) or whether the conduct was still-ongoing, and did not explain that the conduct at issue had led to the termination of the Cole Taylor agreement. Moreover, it was accompanied by false and misleading positive statements about Higher One's improving compliance and capped exposure to regulators and the class plaintiff, as described in the prior paragraph, which muted the effect of the investigation disclosure.

55.    On February 13, 2014 the Company hosted an earnings call with analysts and investors (the "2/13/2014 Earnings Call"), on which defendant Volchek participated. During the call, in prepared remarks, defendant Volchek stated the following (emphasis added):

> *While we have greatly strengthened our compliance efforts over the past year, we continue to invest additional resources to make compliance even stronger*. Even as *the improvements and investments in compliance and internal audit are showing good progress*, working with our bank partners and regulatory oversight remain key risks for the company. *During 2013, a number of changes were made to our products and processes*. Some of these changes have a direct effect to lower revenue or increase expenses. We made these changes, and we believe in the long run this will be positive for the business. *We believe that these changes have helped* our sales teams in our effort to sign new refund clients and *in our relations with OneAccount holders*.

56.    The 2013 10-K also contained the following statements about Higher One's internal controls: "Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. ... Based on this evaluation, *management concluded that the company's internal control over financial reporting was effective* as of December 31, 2013."

57.    On May 8, 2014, Defendants caused Higher One to issue a press release (the

"5/8/2014 Press Release") that was filed with the SEC as an exhibit to a Form 8-K that quoted defendant Sheinbaum (the "5/8/2014 8-K") announcing the Company's financial and operating results for Q1 2014. Higher One reported GAAP net loss of $9.7 million and GAAP diluted loss per share of $0.20 on revenue of $66.6 million (compared to GAAP net income of $9.8 million and GAAP diluted EPS of $0.20 on revenue of $57.4 million in the same quarter a year before). The 5/8/2014 Press Release also reported the number of OneAccounts at the end of Q1 2014 as 2.3 million accounts, up 6% from Q1 2013.

58.     The Q1 2014 financial results were materially false and misleading because: (a) described net income, EPS, revenues, and financial and operating results without disclosing that they benefitted from and were the result of operations conducted in violation of applicable laws (including consumer protection laws and §5 of the FTC Act) and Higher One's obligations under the 2012 FDIC Consent Order, its Code of Business Conduct, and its Credit Agreement, and (b) described an increase in the number of OneAccounts without disclosing that the marketing and handling of those accounts, including without limitation the disclosure of applicable terms and the charging of various fees, were done in violation of applicable laws (including consumer protection laws and §5 of the FTC Act) and Higher One's obligations under the 2012 FDIC Consent Order, its Code of Business Conduct, and its Credit Agreement. Given its timing, the misstatements and material omissions found in the 5/8/2014 Press Release were particularly egregious given Defendants failed to disclose the imminent announcement of Federal Reserve sanction and penalties, stemming from Higher One's work with Cole Taylor, as first disclosed just days later in the Q1 2014 10-Q.

59.     On May 11, 2014, Defendants hosted an earnings call with analysts and investors (the "5/11/2014 Earnings Call"), on which defendant Volchek and defendant

Sheinbaum participated. During the 5/11/2014 Earnings Call, the following false and misleading

statements were made:

(a) defendant Sheinbaum stated in relevant part (emphasis added):

Now, turning to our bank partners, clearly the regulatory environment as we operate is fluid and complex due to our relationships with multiple bank partners that are overseen by different regulatory bodies. *Over the course of the past year, we have made tremendous strides in strengthening our compliance efforts. We continued to invest additional resources to make this area even stronger. And these improvements and investments in both compliance and internal audit are showing good progress.*

(b) During the question and answer session, defendant Sheinbaum stated as

follows (emphasis added):

Andrew Jeffrey, Suntrust: Couple of things I guess and I realize you are limited on what you can say on the ongoing Neg-Reg sessions, but *if we look at the most sort of onerous potential outcomes around marketing and fees perhaps can you talk and maybe more on marketing and fees*, I suppose. *Could you talk a little bit about how close you think you are to being compliant, especially on the marketing front* with what could be a worst case outcome? And how you are thinking about sort of being proactive in the context of there is much uncertainty as there is out there as with what the final regulatory outcome is going be like, how you are thinking about that?

CEO Sheinbaum: So, look I think you could appreciate that it's a fluid environment and we really can't speculate a lot on what's happening with negotiated rule making. *I can assure you that in my three weeks here I have spent a considerable amount of time with Casey and the team as he represents the third-party servicers and he has been actively at work in Washington.* And right now*, I think our efforts are doing our best to ensure that the industry's voice is heard* as well as the voices of our clients, the 600 institutions and of course representing the students that use our services, because our effort wants to be make sure that that college and students can receive a valuable service here. So, there will be one more negotiated rule-making session later this month and at the end of which the consensus of vote will be taken. And clearly, we are aware of all the discussions going on. So, I really can't speculate on what outcomes are going to be. And again I know you respect that it's a kind of a critical time right now with the discussions going on in an ongoing basis. So, I think that *it's safe to say to we are trying to be very constructive voice at the table to move forward.*

Andrew Jeffrey, Suntrust: *Is it reasonable to think that Higher* One without

going into specifics internally so to *have some probability rated outcome scenarios and contingency plans. I assume you guys are thinking ahead in that context*?

CEO Sheinbaum: *I think we are spending a lot of time on this topic*.

(c)  Later in the question and answer session, defendant Sheinmbaum was

again asked about compliance, and gave this answer:

David Scharf, JMP: [O]n the regulatory side not to beat a dead horse, say I kind of respect the sensitivity of the Neg-Reg process, I am just curious is there any – so much of the focus obviously has been on the DOE and potential rule making out of this forum, but is there any update or anything to report concurrently that you are hearing from the CFPB as they look into the broader area of higher Ed finance?

CEO Sheinbaum: Not… directly but we certainly are looking forward to having an ongoing dialogue with the CFPB. We are monitoring what they are saying in actions. *We are committed to delivering an account that meets the needs of the students and achieve industry standards for compliance*. And I think as I said earlier that *I believe that we have great product and transparency and pricing  and disclosures that we will be meeting the needs not just of our customers but of the regulators like the CFPB*.

60.    Given their timing, the above-quoted statements are  particularly misleading

in failing to disclose the imminent announcement of Federal Reserve sanction and penalties,

stemming from Higher One's work with Cole Taylor, as first disclosed *the next day* in Higher

One's Q1 2014 10-Q. This is particularly true where analysts repeatedly asked about the focus

of regulators and the disfavorable actions they might take, and where, in  responding, defendant

Sheinbaum specifically addressed Higher One's compliance efforts.

61.    At the time Defendants made the above statements: (a) Defendants had not

adequately revised Higher  One's compliance management system, (b) Higher One was not

compliant with the  2012 FDIC Consent Order's requirements, (c) Defendants could not

reasonably have believed that all  material  exposure related to the 2012 FDIC Consent and

the  underlying conduct  had been  recorded or reasonably have expected no further losses as a

result of the 2012 FDIC Consent and the underlying conduct, (d) Defendants were acting in contravention of the 2010 Code of Business Conduct, (e) Defendants' business practices continued to violate application laws, including, *inter alia*, §5 of the FTC ACT and state and federal consumer protection laws, (f) Defendants' business practices risked default and imposition of remedies upon default under the Credit Agreement and its terms, including those terms summarized herein, and (g) Defendants' business practices and continued misconduct jeopardized its revenues and profits. Indeed, contrary to Defendants' false and misleading statements during the Relevant Period, Higher One was not compliant, and had not been compliant throughout the Relevant Period, with its legal obligations under the 2012 FDIC Consent Order, the 2010 Code of Business Conduct, the Credit Agreement, and applicable laws, including those obligations regarding marketing to consumers and charging fees to consumers, and this ongoing misconduct exposed Higher One to severe sanctions and monetary penalties, potential loss of additional bank partners, and potential default and imposition of remedies under the Credit Agreement.

## The Truth Emerges

62.      The truth about Defendants' breaches of fiduciary duties and gross corporate mismanagement was revealed in a series of disclosures beginning on May 12, 2014. After hours on May 12, 2014, Higher One filed its Form 10-Q for the quarter ended March 31, 2014 with the SEC (the "Q1 2014 10-Q"), which was signed and SOX certified by defendant Sheinbaum. The Q1 2014 10-Q disclosed that Higher One faced penalties from the Federal Reserve relating to marketing and disclosure practices regarding its OneAccount product – the very issues for which it was saddled with the FDIC Consent Order in 2012 – regarding not one, but *two*, *bank partners*. Moreover, it disclosed that the potential penalties were

31

*severe enough that they could trigger a default on its Credit Facility, which at the time had*

*$94 million in outstanding borrowings*.  Specifically, Defendants disclosed:

> On May 9, 2014, the Board of Governors of the Federal Reserve System, or the Board of Governors, advised us of its determination to seek an administrative order against us with respect to asserted violations of the Federal Trade Commission Act relating to our activities with both a former and current Bank Partner and our marketing and disclosure practices related to the process by which students may select the OneAccount option for financial aid refund. We are in discussions with the Board of Governors in this matter. Any administrative order arising out of this matter is likely to include demands for material customer restitution, material civil money penalties, and changes to certain of our business practices and could have a material adverse effect on our business, financial condition, and results of operations. Although the ultimate amount of restitution or civil money penalties are subject to many uncertainties and therefore are impossible to predict, it is possible the amounts could reach levels that would cause an event of default under our Credit Facility. While we believe that it is probable that we will have a loss related to this regulatory matter, in view of the inherent difficulty of predicting the outcome of regulatory matters, we cannot predict what the eventual outcome of this pending matter will be, what the timing of the ultimate resolution of this matter will be or the potential range of loss associated with this matter. We are currently unable to estimate a range of loss associated with this matter because it is in an early stage.

63.     On this news, shares in Higher One's stock price fell $0.90, or over 14%, on heavy trading volume, to close at $5.51 on May 13, 2014, down from its prior day's closing price of $6.41.

64.     On May 14, 2014, Bloomberg News published an article before the market open regarding a Department of Education proposal to ban most account fees involved in the multimillion-dollar marketing deals between universities, banks, and companies like Higher One. The article cited lawmakers and consumer groups that had argued for years that such contracts can expose students to unreasonably high fees for things like cash withdrawals or overdrafts – exactly the sort of misconduct perpetrated by Higher One. In discussing the proliferation of contracts between financial institutions and education institutions, the article

specifically cited  Higher One's arrangements with colleges pursuant to which it helps manage

the disbursement of federal aid into student accounts. Under the heading "'Unfair' Practices",

it also cited a letter  from 24 lawmakers to the Department of Education telling it to "protect

students from unfair banking practices" by banning fees on accounts receiving federal

financial aid and publicizing  bank contracts for student products, among other steps.

65.     On this news, shares in Higher One's stock price fell $0.44, or nearly 8%,

on  heavy trading volume, to close at $5.07 on May 14, 2014, down from its prior day's closing

price  of $5.51.

66.     In the wake of the revelations on May 13-14, 2014, Sadif Analytics published

an  analyst report on May 15, 2014, which, among other things identified the "negative outlook"

on  Higher One, described Higher One's financial risk in terms of both liquidity and market

volatility as high, identified its volatility risk outlook as negative, and gave Higher One an SMR

StockMarks rating of 37/100 while noting its recent revision downward with a month-to-month

negative trend. The report's conclusions characterized Higher One as an average long-term,

investment, noting Higher One's significant share price decline over the past year, its below

average likelihood of outperforming the market, and the "well above average" market risk

associated with holding its shares.

67.     On this news, Higher One's stock price fell $1.26, or nearly 25%, on heavy

trading volume, to close at $3.81 on May 15, 2014, down from its prior day's closing price  of

$5.07.

68.     Further details regarding these disclosures became available on July 1 ,  2014

when the Federal Reserve issued a press release detailing Defendants' wrongful conduct

and detailing the penalties it faced, including restitution payments. Per the  Federal Reserve,

33

Defendants caused Higher One to engage in "deceptive practices...that, at various points in

the financial aid refund selection process, mislead students about the OneAccount," including:

- The omission of material information about how students could get their financial aid refund without having to open a OneAccount;

- The omission of material information about the fees, features, and limitations of the OneAccount product, which may have made it more difficult for students to make fully informed decisions prior to selecting the method for financial aid refund disbursement;

- The omission of material information about the locations of ATMs where students could access their OneAccount without cost and the hours of availability of those ATMs; and

- The prominent display of the school logo, which may have erroneously implied that the school endorsed the OneAccount product.

69.     The same day, the State of Illinois, Department of Financial & Professional

Regulation ("IDFPR") issued a press release likewise detailing Defendants' misconduct and

resulting penalties. It quoted the IDFPR Acting Secretary as saying, "***It is unconscionable***

***for any company to seek profit by misleading customers about the terms of their financial***

***accounts***." (Emphasis added). It went on to spell out the wrongful conduct Defendants had

perpetrated, involving the very same OneAccount that had been at issue in the FDIC Consent

Order in 2012. Specifically, the IDFPR said that Defendants had caused "Higher One...[to]

mislead students at various points in the financial aid process, including by:"

- Failing to disclose on all relevant documents how students could access their financial aid payment without having to open an online "OneAccount." Higher One and Cole Taylor Bank benefited from students directing their financial aid payments to the OneAccount, instead of to an alternative bank account or paper check. During the timeframe of IDFPR's consent order, approximately 440,000 new OneAccounts were opened at Cole Taylor.

- Failing to disclose the fees, features, and limitations of the OneAccount. Higher One required unusual fees, such as a 50-cent fee for not using the debit card as a credit card and a fee of 3.5

percent for withdrawing cash at a bank teller. Higher One earned income from all fees paid by students in connection with the accounts. Cole Taylor received benefits from holding and deploying the funds held in the non-interest bearing accounts.

- Failing to disclose information about the locations of ATMs where students could access their OneAccounts without incurring costs; and

- Prominently displaying the school logos, which may have erroneously implied the schools endorsed the OneAccount product.

70.    Both press releases contained links to the Cease and Desist Order, dated June 26, 2014, levied against Higher One. The Cease and Desist Order explained the conduct at issue in even greater detail. It explained that many types of financial aid funds are first distributed in full to a school, which deducts tuition and other amounts payable to the school itself, before needing to disburse the rest to students in what is called a "refund." Refunds are typically processed via either a check or an automated clearing house ("ACH") transfer to a student's existing bank account. Higher One's OneDisburse service (a/k/a "Refund Management" service) permitted schools to outsource the financial aid refund disbursement process, to save time and costs. Higher One handled the process, and offered students direct deposit to its OneAccount products (OneAccount, OneAccount Flex, OneAccount Edge, and OneAccount Premier), among other options.

71.    The Cease and Desist Order also described how Defendants caused Higher One to capture fees paid by students in connection with these OneAccount accounts, some of which were unusual, like a $0.50 fee for not using a debit card as a credit card and a 3.5% fee for accessing case at a bank teller, in addition to interchange fees paid by merchants who accepted the debit cards.

72.    In this context, the Cease and Desist Order made clear that Higher One controlled students' access to and information about financial aid refund disbursement options, because

Higher One's website was used by students at colleges and universities participating in the OneAccount program to select the method of financial aid refund disbursement. This setup triggered all the truthfulness, disclosure, and marketing obligations arising under the 2012 FDIC Consent Order and Higher One's Code of Business Conduct, as described *supra*.

73.    Yet, the Cease and Desist Order makes clear that Defendants' conduct ran gravely afoul of these obligations, constituting "acts or practices in or affecting commerce, within the meaning of  section 5(a)(1) of the FTC Act (15 U.S.C. § 45(a)(1)), and unsafe or unsound banking practices."  As described by the Federal Reserve:

> The Higher One website and associated materials contained material omissions related to the OneAccount, which were likely to mislead students acting reasonably under the circumstances. Information about the fees, features, and limitations of the OneAccount was omitted entirely or was not clear and conspicuous. Examples of these omissions that were in effect during the Relevant Period included, but were not limited to:
>
> (i)    There was no information on the refund disbursement home page about the ACH transfer to another bank account and paper check options, either of which may have enabled students to access their student financial aid refunds with  fewer fees.
>
> (ii)    On the web page where the student made a choice about the method of refund disbursement, information about the speed of receiving a refund through the OneAccount was readily available, but there was no information about the fees, features, and limitations of the OneAccount, which may have made it more difficult for students to make a fully informed decision prior to selecting the method for financial aid disbursement.
>
> (iii)    Information about ATM locations was not available on the web page where the student made a choice about the method of refund disbursement. There was no information about the ATM hours of availability on any of the web pages, even though some ATMs were on campus locations that were in some cases closed on nights, weekends, and holidays.
>
> (iv)    It was only at the final web page, after the student had entered all personal information, that a complete fee schedule and the terms and conditions were readily available for the student to view. The fee schedule contained information about ATM fees, but the student would need to click on another link to find information about ATM locations. There was no information on ATM hours of  availability. If  the student wanted to change his or her choice of

refund delivery mechanism, the student would need to back out through previous screens to reach the starting web page

(v)     Although Cole Taylor is a bricks-and-mortar institution, there was no information on the website clarifying that the OneAccount was an Internet-based checking account.

(vi)    The website featured the school logo more prominently than the Higher One logo or the fine-print reference to Cole Taylor, which may have erroneously implied that the schools endorsed the OneAccount as the preferred method of disbursement of financial aid refunds.

74.     In an August 7, 2014 press release (the "8/7/2014 Press Release") filed with the SEC as an exhibit to an 8-K on August 7, 2014 (the "8/7/2014 8-K"), Defendants caused Higher One to disclose that it had made an $8.7 million allowance for customer restitution. The 8/7/2014 8-K appended slides that alarmingly set forth as follows:

- In discussions with Federal Reserve regarding potential restitution

- Recorded allowance of $8.75 million for restitution

- Potential exposure of $35 million for Federal Reserve bank partner customers

- Additional potential exposure of $35 million for FDIC bank partner customers

- Uncertain of timing

75.     The same day, also on August 7, 2014, Defendants hosted an earnings call with analysts and investors (the "8/7/2014 Earnings Call"), on which defendant Sheinbaum participated. During this call, he disclosed the massive scope of Higher One's potential liabilities related to the misconduct underlying the breaches of fiduciary duties:

(a)     During prepared remarks, defendant Sheinbaum disclosed a whopping ***$70 million potential liability***, extending to all of Higher One's bank partners, both those regulated by the Federal Reserve ***and*** those regulated by the FDIC:

Let me spend a few minutes discussing the regulatory environment. As many of you know, in early May, the staff of the Board of Governors of the

Federal Reserve notified us that they intended to recommend that the Board of Governors seek an administrative order against the company with respect to asserted violations of the Federal Trade Commission act. The cited violations relate to our activities with both a former and current bank partner, and our marketing and disclosure practices related to the process by which students may select the OneAccount option for Financial Aid refund. ***During this quarter, we recorded a liability of $8.75 million related to this matter, which is shown as an allowance for customer restitution on our consolidated statement of operations. There is a reasonable possibility that the liability related to this matter will increase in future periods. In fact, the staff of the Board of Governors has asserted that any administrative orders may seek damages, including customer restitution and civil money penalties, totaling as much as $35 million and changes to certain of our business practices.*** We are in discussions with the staff of the Board of Governors and the Federal -- and the Reserve Bank on this matter. ***Approximately 55% of the OneAccounts are held at our bank partner regulated by the FDIC. And we will need to consider providing restitution voluntarily to those OneAccounts. In the event we do provide restitution to these OneAccounts on the same basis as an order from the Board of Governors of the Federal Reserve, it is reasonably possible that our loss related to this matter will increase accordingly, and increase our total exposure by an additional amount of approximately $35 million or approximately $70 million in total.***

(b)     During prepared remarks, the Company's Chief Financial Officer Christopher

Wolf disclosed the grave risks that Higher One faces under its Credit Facility:

Let me cover the impact of the pending regulatory matters on our credit facility and liquidity sources. As Marc mentioned, we recorded an allowance for potential customer restitution of $8.75 million during the quarter. This charge reduces our EBITDA based on the definitions in our credit facility although the ultimate amount of restitution or civil money penalties are subject to many uncertainties and, therefore, impossible to predict. ***It is reasonably possible that amounts could reach levels that could cause an event to default under the credit facility. In addition to the $50 million minimum EBITDA threshold, a settlement with regulatory authorities exceeding $10 million could cause a default under the other covenants in the credit facility.*** We believe that our cash flows from operations, together with existing liquidity sources, will be sufficient to fund our operations and anticipated capital expenditures over the next 12 months.

***However, it is possible the amounts that we are required to pay related to these regulatory matters could reach levels that would exceed our available cash flows from operations and existing liquidity sources available through our credit facility. In that case, we would seek additional forms of financing or other sources of liquidity to supplement our existing liquidity sources. It is possible that the charge could be of such magnitude that it would***

*cause an event to default under our credit facility*. In the event of a default, depending on the amount loss, we believe that we may be able to obtain relief under certain of our current covenants. However, there can be no assurance we would receive an amendment or a waiver. If there is an event of default under our credit facility, the amounts then outstanding may be immediately due and payable. In such an event, we may seek -- we may need to seek alternative forms of financing or other sources of liquidity in order to repay the amount outstanding under our credit facility, but there can be no assurances that such alternative forms of financing or other sources of liquidity would be available to us on favorable terms or at all.

76.     Following these statements confirming Defendants' breaches of fiduciary duties and gross mismanagement, Higher One's stock price fell $0.43, or 10.4%, on high volume, from its August 6, 2014 closing price of $4.14 to close at $3.71 on August 7, 2014.

77.     On August 8, 2014, Defendants caused to be filed Higher One's Form 10-Q for the period ending June 30, 201 and was signed and SOX certified by defendant Sheinbaum. This filing reiterated the disclosures from the 8/7/2014 Earnings Call, disclosing that Higher One had recorded a reduction of its revenues of $8.75 million during the three months ended June 30, 2014 – as a minimum allowance for customer restitution – as a result of an ongoing regulatory examination. The Q2 2014 10-Q described the risk faced by Higher One as follows, making clear that the Company's exposure *could extend not only to the Federal Reserve banks but also the FDIC banks and could reach $70 million*:

> The allowance for customer restitution reduced our revenue and trailing twelve month EBITDA by $8.75 million during the quarter ended June 30, 2014. If there is any event of any default under our credit agreement, all amounts then outstanding may be immediately due and payable and may require us to apply all of our available cash to repay these amounts. We may also need to seek alternative forms of financing or other sources of liquidity in order to repay these amounts. There can be no assurances that such alternative forms of financing or other sources of liquidity would be available to us on favorable terms or at all. The acceleration of indebtedness under our credit agreement could have a material adverse effect on our business, financial condition and results of operations.

***

On May 9, 2014, the Federal Reserve Banks of Chicago (the responsible Reserve Bank for a former bank partner) and Philadelphia (the responsible Reserve Bank for a current bank partner) notified us that the staff of the Board of Governors of the Federal Reserve System intended to recommend that the Board of Governors of the Federal Reserve System, or the Board of Governors, seek an administrative order against us with respect to asserted violations of the Federal Trade Commission Act. The cited violations relate to our activities with both a former and current bank partner and our marketing and disclosure practices related to the process by which students may select the OneAccount option for financial aid refund. We are in discussions with the Staff of the Board of Governors and the Reserve Banks on this matter. The Staff of the Board of Governors has asserted that any administrative order may seek damages, including customer restitution and civil money penalties, totaling as much as $35 million, and changes to certain of our business practices.

Approximately 55% of the OneAccounts are held at our bank partner regulated by the FDIC and we will need to consider voluntarily providing restitution to those OneAccounts held at that bank partner. In the event we do provide restitution to these OneAccounts on the same basis as an order from the Board of Governors, it is reasonably possible that our loss related to this matter will increase accordingly and increase our total exposure by an additional amount of approximately $35 million, or approximately $70 million in total.

During the quarter ended June 30, 2014, we recorded a liability of $8.75 million related to this matter, which is shown as an allowance for customer restitution on our consolidated statement of operations. While we believe that it is probable that we will have a loss related to this regulatory matter, in view of the inherent difficulty of predicting the outcomes of regulatory matters, we cannot predict the eventual outcome of this pending matter, the timing of the ultimate resolution of this matter or an exact amount of loss associated with this matter. The liability recorded at June 30, 2014 reflects the minimum amount we expect to pay related to this matter, although, there is a reasonable possibility that the liability will increase in future periods.

78.    As a result of Defendants' breaches of fiduciary duties, Higher One has been damaged.

79.    Paragraph 2(d) of the 2012 FDIC Consent Order mandated that Higher One implement a compliance audit component, which it deemed "necessary to ensure an effective and independent review of its internal policies and procedures and compliance with Consumer Protection laws," and that it implement policies, procedures, and processes that

ensure: (i) independent and adequate audit practices and procedures consistent with GAAP; (ii) completion of a compliance audit plan each calendar year that is reviewed and approved by Higher One's Board; (iii) annual risk assessments to ensure compliance audits are conducted with reasonable frequency; (iv) "assignment of ratings or expressions of opinion as to the adequacy, effectiveness, and efficiency of the internal control environment and compliance audit findings, deficiencies, and recommendations relating to a Product or Service, as documented in a written report and provided to the Audit Committee of the Board, together with a report of the Committee's actions in response to the audit, including where applicable an explanation why a recommendation has not been implemented; and (v) provisions for an adequate formal tracking and monitoring system for exceptions that are identified through compliance audits or regulatory examinations. Defendants failed in their fiduciary obligations to Higher One by failing to make each of these changes.

80. Thus, all Defendants, but in particular the Audit Committee and Risk and Compliance Committee members, had actual knowledge of the facts and circumstances alleged above, or if they lacked such knowledge, that they lacked it only due to their reckless disregarded of red flags raised by the facts and circumstances alleged above. As disclosed in Higher One's DEF 14A filings with the SEC during the Relevant Period, seven members of the Board, including defendants Volchek, Lasater, McFadden, Biddelman, Hartheimer, Robinson and Anderson served on the Board and either the Audit Committee and/or the Risk and Compliance Committee.

81. The breaches of fiduciary duties alleged herein implicate the core operations of Higher One. The OneAccount the fees charged on it and other consumer accounts, and the marketing of these accounts to consumers are at the heart of Higher One's business and

operations and, according to its SEC filings and investor presentations during the Relevant Period, accounted for a considerable portion of its revenues, income, and projected growth.

82.     As alleged herein, the 2012 FDIC Consent Order made clear that Higher One's prior misconduct and its considerable legal obligations, not only under the Consent Order itself, but also under applicable laws including §5 of the FTC Act. Moreover, the 2012 FDIC Consent Order imposed significant monetary penalties and caused the termination of Higher One's relationship with one of its partner banks. As a non-bank itself, Higher One must rely on such relationships with banks in order to offer consumers its OneAccount and other banking products. The termination of such a relationship, and the correlating damage to Higher One's stature and reputational capital among similar banks and the education financing industry, are a significant negative outcome for Higher One.

83.     If Defendants' misconduct during the Relevant Period became known earlier, Higher One would have faced significant monetary penalties, the loss of other bank relationships, and additional damage to Higher One's stature and reputational capital. This reality provided Defendants with strong motive to conceal their conduct and commit the breaches of fiduciary duties alleged herein. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, Higher One has sustained significant damages, including, but not limited to, the costs and expenses incurred in connection with the legal action taken against the Company.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

84.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Defendants' breaches of fiduciary duties.

90.     Plaintiff is a shareholder of the Company, was a shareholder of the Company at

the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.

91.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

92.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

93.     The Board currently consists of ten directors: defendants Anderson, Biddelman, Braunstein, Cromwell, Hartheimer, Lasater, McFadden, Robinson, Volchek and Steinbaum. When a board is comprised of an even number of directors, such as in this case, a plaintiff need only demonstrate that half of the directors are interested or lack independence. Plaintiff has adequately alleged that at least five members of the Board are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

    a. Defendants Lasater and Volchek, as co-founders of the company and current employees lack independence and/or are not disinterested given their personal financial interest in the outcome of this litigation. Furthermore, the Company's most recent proxy statement admits that defendants Lasater and Volchek are not independent.

    b. Defendants Volchek, Lasater, Biddelman, Braunstein, Cromwell, Hartheimer and McFadden signed the Company's 2013 Form 10-K, which failed to disclose the scheme alleged herein, making it materially false and misleading.  As such, each of these defendants faces a substantial likelihood of personal liability, excusing demand.

    c. Defendant Sheinbaum is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Sheinbaum's principal professional occupation is his employment as CEO of the Company, pursuant to which defendant Sheinbaum stands to earn millions of dollars

in annual salary, bonuses and other compensation. Accordingly, defendant Sheinbaum is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. Additionally, the Company's May 5, 2014 Proxy admits that defendant Sheinbaum is not independent. As such, Sheinbaum is interested and lacks independence for purposes of demand.

d.  Defendants Biddelman, Hartheimer, McFadden and Robinson are/were members of the Board's Audit Committee during the time the wrongdoing alleged herein was taking place. As such, defendants Biddelman, Hartheimer, McFadden and Robinson had additional duties delegated by the Board to actively oversee the Company's legal and regulatory compliance, including its adherence to accurate and forthright SEC disclosure, the Company's internal controls and the Company's internal audit functions. These duties were heightened given the obligations imposed by the Consent Order and these defendants were required to ensure compliance with its terms. These defendants utterly failed in their duties. Accordingly, defendants Biddelman, Hartheimer, McFadden and Robinson face a substantial likelihood of personal liability and thus are incapable of independently and disinterestedly considering a demand.

e.  Defendants Anderson, Hartheimer and Robinson are/were members of the Board's Risk and Compliance Committee during the time the wrongdoing alleged herein was taking place. As such, Defendants Anderson, Hartheimer and Robinson had additional duties delegated by the Board to actively oversee the Company's legal and regulatory compliance, including, specifically, the Company's adherence the Federal Deposit Insurance Act and the FTA Act. These duties were critical to the Company's success given the obligations imposed by the Consent Order and these defendants were required to ensure compliance with its terms. These defendants utterly failed in their duties. Accordingly, defendants Anderson, Hartheimer and Robinson face a substantial likelihood of personal liability and thus are incapable of independently and disinterestedly considering a demand.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES OF CARE, LOYALTY AND GOOD FAITH

94.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

95.  As alleged in detail herein, each of the Defendants (and particularly the Audit and Risk and Compliance Committee members) had a duty to ensure that Higher One disseminated accurate, truthful and complete information to its shareholders.

44

96.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Higher One shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

97.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

98.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

99.     As alleged herein, Defendants willfully ignored the obvious and pervasive problems with Higher One internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

100.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.     Defendants owed and owe Higher One fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Higher One the highest obligation of good faith, fair dealing, loyalty and due care.

45

102.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

103.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Higher One has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

104.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

105.    Plaintiff, on behalf of Higher One, has no adequate remedy at law.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

106.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Higher One.

108.    Plaintiff, as a shareholder and representative of Higher One, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Higher One to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to Higher One restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 6, 2015

**IZARD NOBEL LLP**

_____
Robert A. Izard, Bar No. ct01601
Mark P. Kindall, Bar No. ct13797
Seth R. Klein, Bar No. ct18121
Nicole A. Veno, Bar No. ct29373
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email: rizard@izardnobel.com
Email: mkindall@izardnobel.com
Email: sklein@izardnobel.com
Email: nveno@izardnobel.com


**THE SHUMAN LAW FIRM**
Kip B. Shuman
Rusty E. Glenn
885 Arapahoe Avenue
Boulder, CO 80302
(303) 861-3003
Fax: (303) 484-4886
Email: kip@shumanlawfirm.com
Email: rusty@shumanlawfirm.com

_Attorneys for Plaintiff_

## HIGHER ONE VERIFICATION

I, Jason M. Sabel, hereby verify under the penalty of perjury that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief based on the investigation of my counsel.

Date: 3-2-2015

Jason M. Sabel